## THE MECHANICS NATIONAL BANK AT NEWARK

*v.*

## THE H. C. BURNET MANUFACTURING COMPANY and WILLIAM S. SQUIER.

**1.** Objections which relate to the regularity of a judgment at law, or to the validity of the instrument upon which it is founded, are not relievable in equity.

Mechanics National Bank *v.* Burnet Manufacturing Company.

2. The remedy for grievances of this character is either by application to the court in which the judgment is entered, or by writ of error.

3. A judgment at law can only be impeached in a court of equity for fraud in its concoction, or upon a purely equitable defence, or upon the ground that a good defence at law has been lost by fraud, ignorance or accident.

4. Fraud perpretated by means of a judgment is entitled to no more immunity than a fraud perpetrated by any other means.

5. If a judgment, founded upon a just debt, is entered not for the purpose of securing or collecting the debt, but for the purpose of being used as a cover, to protect the defendant's property from his other creditors, the court will denounce it as a fraud and set it aside, as it would any other fraudulent contrivance.

On final hearing on bill, answers and proofs taken before vice-chancellor.

*Mr. Albert P. Condit,* for complainants.

*Mr. John Lilly,* for defendant Squier.

*Mr. John Whitehead,* for corporate defendants.

THE VICE-CHANCELLOR.

The complainants are judgment creditors of the H. C. Burnet Manufacturing Company. Their judgment was recovered in the supreme court of this state, October 19th, 1878. The defendant, William S. Squier, was also a judgment creditor of this corporation. He had six judgments. They were entered in the first district court of the city of Newark, on September 4th, 1878. Executions were immediately issued on them, and a sale made thereunder on the eleventh day of the same month. The sale embraced all the property of the corporate defendants seizable by execution. The judgment debtors were, at the time of the sale, engaged in the manufacture and sale of inks, mucilage and sealing wax, and though their property consisted of a large number of different articles, some manufactured, some in course of manufacture and some in a raw state, some packed in boxes and some unpacked, it was all sold in one bulk. The

defendant Squier purchased the whole. The complainants seek to have this sale set aside and to hold Mr. Squier responsible for the value of the goods, on the ground that he obtained his judgments and afterwards used them, not for the purpose of collecting or securing his debt, but to place the property of his debtors where it could not be reached by legal process, and thus enable them to defraud their creditors. If the case made by the bill is established by the proofs, there can be no doubt that the complainants are entitled to relief.

The defendants, however, deny that the complainants are entitled to the character they assume. They say they are not judgment creditors. They urge two objections against the validity of the complainants' judgment. First, they say the court in which they recovered their judgment never acquired jurisdiction of the person of the corporate defendants, the summons in the action having been served on a person not authorized to receive service for the corporation; and second, they aver that the debt on which the judgment is founded was not the debt of the corporate defendants, but of one of their officers. These objections, I am of opinion, cannot be considered here. The court which pronounced the judgment in question was entirely competent to hear them, and to give adequate relief, if it found that the defendants were entitled to it.

Courts of equity sometimes give relief against judgments at law, but only where it is shown that the defendant was ignorant of the facts on which his defence rests until after the time for making defence at law had passed; or that he was prevented from making defence by the artifice or fraud of his adversary, or by accident unmixed with negligence or fraud on his part, or that his defence is a matter of pure equity cognizance. But in cases where the grievance he attempts to urge is one that the court which pronounced the judgment is competent to hear and decide, and he has either urged it there unsuccessfully, or has negligently omitted to do so, this court can give no relief. *Reeves* v. *Cooper, 1 Beas. 223 ; Vaughn* v. *Johnson, 1 Stock. 173 ; Holmes* v. *Steele, 1 Stew. Eq. 173.* The precise question mooted in

Mechanics National Bank *v.* Burnet Manufacturing Company.

this case was decided in *Stratton* v. *Allen, 1 C. E. Gr. 229.* Chancellor Green there said:

"Objections which relate to the regularity of a judgment, or to the validity of the instrument upon which it is founded, constitute no ground for the interference of this court. If the instrument upon which a judgment is entered was without consideration, or invalid, or if the judgment itself is unauthorized, or illegal, the remedy for the party aggrieved would be by application to the court in which the judgment is entered, or by writ of error. They are questions exclusively for the cognizance of those courts. It seems to be conclusively settled that a judgment can only be impeached in a court of equity for fraud in its concoction."

This court is not at liberty, therefore, to entertain the objections interposed by the defendants.

There seems to be no proof in this case which will justify the conclusion that the judgments of the defendant Squier were not founded upon a just debt. But this does not preclude an inquiry whether they were not obtained and used for a fraudulent purpose. A judgment may be founded upon an honest debt, and yet it may be obtained under such circumstances and used for such purposes as to make it a fraud. If it is recovered not for the purpose of securing the debt, but solely to be used as a fraudulent cover to protect the defendant's property from his other creditors, it is a fraud, and the courts may deal with it as they would with any other fraudulent contrivance. Fraud perpetrated by means of a judgment is no more entitled to immunity than a fraud perpetrated by means of a deed or mortgage. *Jones* v. *Naughright, 2 Stock. 298.* That the forms of law have been pursued is no protection in a court of equity, if the result aimed at and reached is fraud. *Metropolitan Bank* v. *Durant, 7 C. E. Gr. 35; S. C., on appeal, 9 C. E. Gr. 556.*

If a judgment creditor uses his judgment for a fraudulent purpose, as against subsequent judgment creditors, he will be postponed until after they are paid. As for example, if, after levy, he allows the property to remain in the possession and under the control of his debtor for such length of time and under such circumstances, as to justify the conclusion that his object in obtaining it was not to secure or collect his debt, but to protect

his debtor in the enjoyment of his property and to prevent his other creditors from seizing it for the satisfaction of their debts, his judgment and levy will be declared void as to subsequent judgment creditors. *Casher* v. *Peterson, 1 South. 317; Williamson* v. *Johnson, 7 Hal. 86; Caldwell* v. *Fifield, 4 Zab. 150.* Fraud destroys whatever it taints, whether it be perpetrated through the machinery of the law or by other means.

The important question then is, Did the defendant Squier obtain his judgments for the purpose of perpetrating a fraud, or has he made a fraudulent use of them? They were obtained under very extraordinary circumstances. He is a dealer in chemicals, and furnished the corporate defendants with all the material they required in their business. At the time he sued, the corporation had but a single officer, at least so Mr. Squier believed. He says the secretary was the only officer he knew or recognized, and he exercised absolute control over all the affairs of the corporation. He and the secretary were on exceedingly intimate and friendly terms; he had been permitted for some time to store his chemicals on the premises of the defendants, and for more than a month prior to the time when he sued, he had been furnished a room in the factory of the defendants, by the secretary, where he received his mail and attended to his correspondence. His six suits were brought on the 29th of August, 1878. He heard of the complainants' claim about this time, but he says he never thought the corporation owed them anything. When he sued, his whole claim amounted to $1,163.15. Of this amount he says $242.17 was borrowed money, and advanced in three loans: $25 August 17th; $50 August 24th, and $167.71 on August 27th. He says he paid in addition, on August 24th, in the purchase of a judgment against the corporation, the sum of $146.95. He made the purchase at the request of the secretary, and took an assignment of the judgment. He admits he believed the corporation was solvent when he sued. The judgment purchased seems to have been the only one which, up to that time, had been recovered against the corporation, and, so far as the evidence shows, no creditor had previously sued them. He and the corporation, prior to this time, had been in the habit of issuing notes for the

accommodation of each other. Before bringing his suits he made no effort either to collect his debt or to have it secured, though the corporation undoubtedly, with very little effort, could have raised the sum necessary to pay it, and had property amply sufficient to secure it. He says he asked, on August 28th, for the return of the $167.71, loaned August 27th; payment was not made, but he does not pretend that his demand was repulsed offensively, so that his indignation was aroused, or that any disclosure was made which excited his fears. In his narrative of what preceded the suits, nothing can be found which justifies his conduct, or discloses the slightest reason or motive for his suits. In view of the facts, as he states them himself, it is impossible to resist the conviction that his suits were not the result of a scheme, concocted by him and the secretary, to attain some object which he now desires to conceal.

The events occurring at the sale, as well as those which undeniably preceded and succeeded it, show, I think, with even greater clearness, the real purpose of the parties. Mr. Squier says, after he obtained his judgments, he told the secretary he was going to sell if he was not paid. The secretary was not disturbed by this announcement, at least he did nothing and said nothing to prevent the threat from being carried into execution. A short time before the sale, it is proved that the secretary exhibited a bundle of papers, which he said were the advertisements put up by the constable, and that they had not been up five minutes before they were taken down. No attempt has been made to prove where the notices of this sale were set up, or to show that they remained up for a longer time than that mentioned by the secretary. On the day before the sale and on the day of the sale, the secretary made an inventory of all the tangible property of the corporation. Why he did so does not appear. It was not exhibited at the sale. The defendant says he never saw it. The hands employed in the factory were kept at work until midday on the day of sale, when they were sent away by order of the secretary, and given leave to use the balance of the day as a holiday. They were not discharged, nor informed of the sale, nor does it appear that the slightest intimation was given

to them that it was at all uncertain whether they would be required to resume work in the morning. It does not appear that any of them were at the sale, and there is nothing to show that they knew a sale was to be made. The secretary sent a messenger for a person that Mr. Squier had requested to attend the sale, but who had not appeared when the constable was ready to proceed.

As already stated, the property was sold as an entirety. The constable thinks he sold it in three lots, but the bidding at the sale, as given by Mr. Squier, shows conclusively that he is mistaken. Who gave direction as to how the property should be sold, neither Mr. Squier nor the constable can tell. Mr. Squier is sure he did not, while the constable says that he publicly asked for direction, and received it, but cannot tell from whom it came. Immediately after the sale, Mr. Squier took possession of the property and also of the factory, though he had acquired no right to the term of the corporation in the factory. He says he told the secretary that he should continue the business, and desired him to remain in charge. The secretary at once consented to do so. Though Mr. Squier positively affirms that he had no understanding or arrangement with the secretary before the sale, yet I think it is impossible for any one to listen to his story describing what transpired between them after the sale, without seeing, almost as clearly as though no effort to conceal anything had been made, that both fully understood that the business was to be continued, and that the secretary was to remain in charge. Mr. Squier admits that he expected the workmen to return the next morning and resume work. Business was resumed the next morning in the name of the corporation, and was continued in its name until this suit was brought. The name of the corporation was used with the consent of its secretary, in order, as it is said, that Mr. Squier might have the benefit of it as a trade mark. The goods sold were shipped in the name of the corporation, with the words "From W. S. Squier" written across the shipping receipt, and charged upon the books of the corporation. The accounts so charged were afterwards assigned by the corporation, acting by its secretary, to Mr. Squier. In one

instance it is proved that an account so charged was collected by draft on the debtor, drawn by the corporation, the secretary, of course, acting for the corporation. A short time after the sale, debts due to the corporation, amounting to about $1900, were assigned by the corporation to Mr. Squier, upon which, he says, he advanced to its secretary, at various times, about $1500. He says he has collected on the accounts so assigned, about $650, and that the officers and agents of the corporation have collected and appropriated the balance.

These facts, in my judgment, speak for themselves. They require no comment. They demonstrate, beyond doubt, the true character of this transaction. They permit but one deduction, and that is, that the judgments and sale were an entirely friendly proceeding, contrived and arranged by Mr. Squier and the secretary of the corporation, for the purpose of effecting an ostensible change in the ownership of the property of the corporation, with intent to defeat the enforcement of the complainant's claim. The assignment to Mr. Squier of the debts due to the corporation, is, I think, tainted with the same illegality. It was the natural sequence of what preceded it, and is manifestly infected with the same evil purpose.

A decree will be advised setting aside the sale and assignment, and requiring the defendant Squier to account for and pay whatever he may have received under either. The complainants are, of course, entitled to costs.